795 S.W.2d 546 (1990)
STATE of Missouri, ex rel. DIVISION OF FAMILY SERVICES, and Shane Ray Reynolds, b/n/f Tina Monita Reynolds, and Tina Monita Reynolds, Individually, Plaintiffs-Respondents,
v.
Michael Allen GUFFEY, Defendant-Appellant.
No. 16274.
Missouri Court of Appeals, Southern District, Division Two.
July 30, 1990.
Motion for Rehearing or to Transfer Denied August 21, 1990.
Application to Transfer Denied October 16, 1990.
*547 James J. Knappenberger, Shaw, Howlett & Schwartz, Clayton, for defendant-appellant.
Janet Garrett, Springfield, for plaintiffs-respondents.
FLANIGAN, Chief Judge.
This is an action to determine the existence of the father and child relationship between Michael Allen Guffey, defendant in the trial court and appellant here, and Shane Ray Reynolds. Plaintiffs in the action, who are respondents here, are the Division of Family Services, Tina Monita Reynolds (the mother), and Shane. The jury returned a verdict in favor of plaintiffs on the issue of paternity. The judgment of the trial court declared Guffey to be the natural father of Shane and ordered Guffey to pay the sum of $150 per month for Shane's support. The judgment awarded Tina sole custody. Guffey appeals.
Guffey's principal contentions on appeal are that the evidence was insufficient to support the verdict, and that the trial court improperly restricted his counsel's cross-examination of plaintiffs' expert, Lee Tuckwiller, and the direct examination of Guffey's experts, Mary Wallhermfechtel, a medical technologist, and William Miller, M.D., a professor of medicine.
*548 These contentions, which will be considered together, require a review of the evidence in light of the principle that the burden of proof in a paternity action rests on the party seeking to establish paternity. Robinett v. Robinett, 770 S.W.2d 299, 303[2] (Mo.App.1989). Since Guffey was never married to the natural mother, and none of the conditions creating a presumption of paternity as enumerated in § 210.822[1] exists, "the burden of proof as to all issues shall be preponderance of the evidence." § 210.839.4.
Tina Reynolds, the mother of Shane, testified: The child was conceived on March 9, 1979, and he was born December 1, 1979, "a full term baby"; she had intercourse with defendant on March 9, 1979; she did not have intercourse with any man, other than the March 9 incident with Guffey, from "the end of December 1978 until June 1979"; she "knew exactly who the father was" and Guffey "is the father of my son."
In April 1988 Tina, Shane and Guffey gave blood samples which were submitted to the testing procedures authorized under § 210.834. Plaintiffs' witness Lee Tuckwiller, Associate Director of the Department of Paternity at Roche Biomedical Laboratories, Inc., Burlington, North Carolina, testified as a witness for the plaintiffs with respect to the results of that testing. Tuckwiller's qualifications as an expert on paternity testing, and similar qualifications of defense witnesses Mary Wallhermfechtel and William Miller, M.D., are conceded by all parties.
Tuckwiller testified: The blood samples from Tina, Shane and Guffey were received in our laboratory on April 27, 1988, and subjected to two types of testing. The first test was the red cell antigen test and in this category five different genetic systems were tested. The second test was the HLA (human leukocyte antigen) test and the HLA A and B systems were examined in this category. Exhibit 3 is the final report showing the test results. Based on those tests, it is not possible to exclude Guffey as the father of Shane, and I calculated a combined paternity index. Using the combined paternity index, and a prior probability of 0.5, the probability of paternity of a man with these test results is 97.32%. Probability of paternity is the equivalent of likelihood of paternity. Tables for these calculations were compiled and published by the American Association of Blood Banks.
Tuckwiller further testified: Based on my evaluation of Exhibit 3, and using the prior probability of 0.5, combined with our paternity index, my opinion is that Guffey is the father.
On cross-examination, Tuckwiller testified: The probability of paternity and the probability of exclusion are not related in any direct way. They are not the same figures and should not be confused.[2] Using *549 a prior probability of paternity of 0.5, which means the non-genetic evidence is neutral, and using the test results, we get a combined paternity index of 36 to 1, and a likelihood of paternity of 97.32%; we tested the ABO system, Rh, MNS, Kell, Duffy and the HLA, A and B genetic system, which I've taken together as a single system"; certain tests were not performed, including the test for red cell enzymes, the test for serum proteins, the Ester HD, the GLO, the AcP, a test for a comparison for TF, a PGM test, or a KIDD test; the tests which were performed were adequate and accurate.
Defense experts on paternity testing were Mary Wallhermfechtel and William Miller, M.D.
Mary Wallhermfechtel testified: Although she had not performed any blood tests herself, she had examined the test results of the Roche Laboratories, as shown on Exhibit 3; in looking at Exhibit 3, it was her opinion that certain tests which should have been done were not done; other tests which should have been performed were: "Red cell enzymes and serum protein tests in varying systems, AcP, transferrin, GC, PGM, haptoglobin, and various other systems thatgenetic marker systems that could have been performed to raise the paternity index and probability of paternity"; if the omitted tests had been performed, "it could affect the results in one or two ways. We either have excluded the alleged father or raised the paternity index."
Dr. Miller testified: Exhibit 3 did not state the probability of exclusion; the probability of exclusion was important; "not enough tests were made here"; tests which should have been taken, and were not, were DNA probes and "many others that could have been done"; the omitted tests could "positively exclude the defendant or they could make the probability so high that the defendant would much more likely, to a reasonable certainty, be the father ... they would have an effect and it could be up or down."
Asked what effect the failure to do the omitted tests would have "on this probability of paternity that appears on Exhibit 3," the witness answered, "Really none. Exhibit 3 has calculated very accurately the probability of paternity for the tests which have been done."
On cross-examination Dr. Miller testified:
"The calculations drawn from those tests [by Roche Laboratories and witness Tuckwiller] agree with our calculations"; there was no reason his laboratory did not perform the tests; neither Guffey nor his attorneys had made a request that his laboratory perform tests; he had no reason to *550 "doubt the conclusions of Dr. Tuckwiller"; the tests actually performed were "for the basis of determining paternity" and "it stacks one test upon the other until you get a finer and finer result and conceivably one could keep doing tests forever until they ran out of tests ... There are some points you reach where there is no return any more or reason to do it"; in his opinion the Roche Laboratories "should have done more tests" but he had no reason to doubt the accuracy of the tests which were performed; the tests which were performed "do, in fact, determine that [Guffey] is more likely to be the father of this child than the average person."
Testifying in his own behalf, defendant Guffey admitted that he had intercourse with Tina on one occasion. He thought that occasion was "after April," but "I am not trying to tell you exactly when it happened." On cross-examination, he testified: "I'm really not sure what might have happened on March 9"; he did not know whether Shane was his child or not; there was no reason why he did not request additional paternity testing.[3]
In reviewing defendant's contention that the evidence is insufficient to support the verdict, "we take the evidence which tends to support the verdict and exclude that which is unfavorable thereto." McCubbins v. Dawson, 743 S.W.2d 459, 460 (Mo.App.1987). Missouri courts take judicial notice that the human gestation period is generally 280 days, although the period of gestation may range up to 11 months. State Div. of Family Services v. Guy, 750 S.W.2d 618, 619 (Mo.App.1988). "Clearly, scientific evidence is but one of the factors to consider in determining paternity." Robinett v. Robinett, supra, 770 S.W.2d at 304[10]. "Obviously, the credibility of the mother who seeks to establish paternity is crucial in such a case." State Div. of Family Services v. J.H.T., 777 S.W.2d 244, 246[1] (Mo.App.1989).
Tina testified that the baby was conceived on March 9, 1979, and born on December 1, 1979, and that the only man with whom she had intercourse from the end of December 1978 until June 1979 was Guffey. Guffey himself admitted he had intercourse with Tina on one occasion, and his testimony is subject to the construction that this might have occurred on March 9. The testimony of Lee Tuckwiller, based on the blood samples from Tina, Shane and Guffey, showed that the likelihood of Guffey's paternity was 97.32%. Exhibit 3, the blood test results, was admitted into evidence without objection. Although the defense experts were of the opinion that additional tests should have been taken, Guffey admitted he requested no additional tests. Defense expert Miller conceded that Exhibit 3 "has calculated very accurately the probability of paternity for the tests which have been done."
This court holds that the foregoing evidence satisfies the burden of proof required by § 210.839.4, which is the preponderance of the evidence, and that the evidence is sufficient to support the verdict.
Guffey contends that the trial court erred: (a) in refusing to allow witness Tuckwiller "to testify [on direct examination], as to what blood tests were made, how they were performed, and their significance," and in limiting cross-examination by "refusing description and explanation of *551 tests done and not done"; (b) in refusing to allow defense witness Wallhermfechtel to testify "as to Red Cross blood test procedures for paternity as differentiated from Roche Laboratories [procedures] and refusing to allow opinions to be stated due to limitations of the latter," and in "limiting" the testimony of defense witness Dr. Miller and "refusing to allow [Dr. Miller] to express an opinion based on the evidence."
An expert witness may base an opinion "upon matters within his personal knowledge or observation, upon competent evidence in the case or upon both." Wiley v. Pittsburg and Midway Coal Min. Co., 729 S.W.2d 228, 232[2] (Mo.App.1987); Howard v. Lundry, 591 S.W.2d 193, 199[13] (Mo.App.1979). (Emphasis added.) Hospital records which have been admitted into evidence may properly be considered by an expert witness as a basis for opinion testimony. Harris v. Goggins, 374 S.W.2d 6, 15[12] (Mo. banc 1963). Similarly, Section 490.065.3, which went into effect after this trial, reads:
"The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable."
Exhibit 3, the test results from the Roche Laboratories, was received in evidence during the testimony of Lee Tuckwiller and prior to the testimony of the two defense experts. During the direct examination of Tuckwiller, counsel for plaintiffs attempted to obtain from the witness testimony concerning paternity testing other than the tests actually conducted. Defense counsel felt that opposing counsel's interrogation was being too restricted by the court and moved for a mistrial. Later in the examination of Tuckwiller, counsel for the plaintiffs stated to the court that he joined in "defendant's prior motion for a mistrial." Both motions were overruled.
During the direct examination of defense expert Wallhermfechtel, she stated that she had looked at the laboratory results "as stated on Exhibit 3." Shortly thereafter the following occurred:
Q. (By Mr. Shaw): Let me ask you this. Would you arrive at a probability of paternity of 97.32 percent without doing something else other than what he did?
A. (By Mr. Privette): Judge, I'm gonna object to that.
The Court: Well, I'll permit the ___ I'll not permit her to answer this specific question because that lets her give an opinion on this. I will let her testify as to anything that she would have included in the test, that was not included or excluded, but not to give her opinion based on what they did, because she wasn't the one who did the test.

Mr. Shaw: That's fine.

The Court: Her opinion will be excluded. She will be permitted to testify what could have been included or excluded in the tests.
Earlier in that direct testimony, Guffey's counsel, Mr. Shaw, stated an offer of proof, which included testing procedures and standards at the witness's laboratory, which had conducted no tests concerning these parties. Guffey's brief contains portions, but not all, of that prolix offer of proof, which was not based on questions posed to the witness or her proposed answers. At the conclusion of that offer of proof, the following occurred:
The Court: The witness will be permitted to testify concerning the tests that have been given at the Roche Laboratories, but not to anything further. Such as the standards that you mentioned that were published by the American Red Cross and the combined index matters and evidence concerning additional tests that were not performed.
Mr. Shaw: Well, is she allowed to draw her conclusion from that test?

The Court: No.

Mr. Shaw: Then the defendant's going to ask that the jury be discharged and a mistrial declared.

*552 The Court: That request will be denied.
From the foregoing it appears, as Guffey argues, that the trial court was of the opinion that expert Wallhermfechtel could not base an opinion on Exhibit 3 which was in evidence.
This court has examined meticulously all portions of the testimony of the three experts and the contents of Guffey's offer of proof. It is significant that defense expert Miller agreed that Exhibit 3 "calculated very accurately the probability of paternity for the tests which have been done." Both defense experts were of the opinion that additional tests should have been taken, and stated that opinion to the jury. The trial court apparently had a misconception of the law set forth in the foregoing authorities. After considering, however, the contents of the rejected offer of proof, together with the testimony which was in fact received, this court concludes that no prejudicial error resulted from that misconception. Portions of the testimony actually given in effect transcended the constraints announced by the trial court. Guffey's principal contentions have no merit.
Guffey's second point reads:
"The trial court erred in overruling defendant's motion for sanctions and in limine heard just prior to trial. Plaintiffs failed to disclose the name of the chief medical witness as well as other miscellaneous information requested by interrogatory. The trial court should have imposed sanctions and precluded the testimony of Lee Tuckwiller, Ph.D. of Roche Laboratory and the results of tests conducted by said laboratory."
Guffey's argument under this point opens with the following: "Defendant filed his motion in limine to exclude certain evidence of testimony on January 19, 1989 (L.F. 56), the date of trial herein. The basis of the motion was that defendant had been advised shortly before trial that one Lee Tuckwiller, Ph.D., would be the primary witness for plaintiffs."
The statement of facts portion of Guffey's brief does not set forth the contents of any motion, nor does it mention any motion. Page 56 of the legal file, which this court has gratuitously examined, contains a motion which makes no mention of Tuckwiller or the Roche Laboratory tests or of any other matter set forth in Guffey's second point. With exceptions not applicable here, Rule 84.13(a) provides that allegations of error not properly briefed shall not be considered in any civil appeal.
Guffey's brief admits that he was advised "shortly before trial" that Tuckwiller would be a witness. Guffey does not define the word "shortly" as he used it. This court has made a gratuitous examination of the record on appeal. The motion to which Guffey intended to allude appears at page 51 of the legal file, and it makes no mention of when Guffey was apprised of Tuckwiller's identity. When that motion was presented to the court for ruling, moments before the trial commenced, Guffey's counsel made no statement to the trial court in support of the motion. Guffey makes no claim that he was not apprised of the contents of Exhibit 3 well prior to the trial. On this record, this court finds no plain error. Guffey's second point has no merit.
Guffey's third point is directed to portions of the testimony of Tina Reynolds. Asked by her counsel how she knew Guffey, her response was, "He is the father of my son." Guffey's counsel objected to that statement and moved that it be stricken on the ground, "that's what the jury is here for and that's the ultimate question." The court said, "It's a conclusion, of course, of the witness, but I'm going to overrule the objection." Guffey cites no case holding that such testimony is improper. Tina had testified that Guffey was the only man with whom she had intercourse during the months of possible conception. No error appears.
Guffey also complains that the trial court erred in denying his motion for mistrial based upon another portion of Tina's testimony. Tina testified that she discovered she was pregnant in April 1979. Asked if she told Guffey, she answered in the negative. Asked why she did not tell him, her answer was, "We are distant relatives. *553 I'm not for sure, fourth, fifth, sixth cousins and approximately, I would say three months, when I found out I was pregnant, him and his girlfriend had an abortion."
There was no objection at that point by Guffey's counsel. After Tina's counsel asked another question, the court interjected a remark and at that point Guffey's counsel requested a mistrial. Guffey's counsel stated no ground for the request, and it was denied. Guffey's counsel then requested that the statement be stricken and the jury admonished to disregard it. The court sustained that request and told the jury to disregard "the part of the testimony having to do with the defendant's wife or girlfriend or whoever it was." Later, Tina was asked by her counsel why she did not "tell the world" that Guffey was the father, and her response was, "due to the fact that we were distant, distant kin and probably two to three months, his girlfriend had an abortion." Guffey's attorney again moved for a mistrial and that request was denied.
The declaration of a mistrial is a drastic remedy and the trial court is vested with wide discretion in determining the prejudicial effect of improper testimony. The jury was directed to disregard Tina's reference to the abortion. The trial court was in a better position to determine its possible prejudicial effect. This court finds no abuse of discretion in the trial court's denial of the requests for mistrial. Guffey's third point has no merit.
Guffey's fourth point is that the trial court erred in refusing to give Instruction A and Instruction B, offered by Guffey.
Instruction A reads:
INSTRUCTION NO. A
You are instructed in this case that the court leaves it to you to determine, from all of the evidence in the case, what the prior probability of paternity should be, in the blood test calculations mentioned in the evidence.
The prior probability of paternity was merely one of the factors to be considered in determining the likelihood of paternity, based on the blood testing. Instruction A emphasizes one evidentiary detail. An instruction "shall not submit to the jury or require findings of detailed evidentiary facts." Rule 70.02(a). Guffey makes no attack upon plaintiffs' verdict-directing instruction or on other instructions setting forth the jurors' responsibilities. This court holds that the trial court did not err in refusing to give Instruction A.
Instruction B reads:
INSTRUCTION NO. B
You are further instructed that if you find and determine from all of that evidence that the probability of exclusion of falsely accused men, in the blood tests mentioned in the evidence, may be less than ninety percent (90%), then you are instructed that the blood test has no value and should not be considered by you in any way, and that the blood test has not and cannot determine whether or not defendant Michael Guffey is the father of the minor child.
There was no evidence to support Instruction B. There was no evidence that the probability of exclusion was or "may be" less than 90%. Exhibit A was received into evidence without objection. The trial court did not err in refusing to give Instruction B. Guffey's fourth point has no merit.
Guffey's fifth point complains of statements made by plaintiffs' attorney in closing argument to the effect that if Guffey was not satisfied with the blood tests, Exhibit A, he should have requested additional testing. Guffey testified he made no such request. This court finds no error in the ruling of the trial court denying Guffey's request for a mistrial. Guffey's fifth point has no merit.
The judgment is affirmed.
HOGAN and SHRUM, JJ., concur.
NOTES
[1] All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.
[2] In Imms v. Clarke, 654 S.W.2d 281 (Mo.App. 1983), the court, in a case involving blood tests generally similar to those here, discussed the meaning of such terms as "probability of exclusion," "prior probability of paternity," and "likelihood of paternity," (sometimes called the paternity index).

The court's remarks concerning each may be summarized as follows:
Probability of exclusion
Probability of exclusion is the probability that the tests employed will exclude a falsely accused man. If the probability of exclusion with the tests employed is 95%, of 100 non-fathers 95 will be excluded and 5 will not be excluded. If the probability of exclusion with the tests employed is 95%, and if no exclusion is obtained, the alleged father is either the true father or he is one of the 5 out of 100 non-fathers that the tests would not exclude. This does not mean that there is a 95% chance that the alleged father is the true father. Of course, the higher the probability of exclusion, the greater is the likelihood of paternity for a non-excluded man, but there is no direct relationship between the probability of exclusion and the likelihood of paternity. Likelihood of paternity cannot be extrapolated from the probability of exclusion. Therefore, probability of exclusion, unless in the extreme range, is of little aid to determine the likelihood that defendant is the biological father. The significance of the probability of exclusion is that if he is not excluded as a possible father, the likelihood of paternity can be estimated by considering other available empirical evidence. A probability of exclusion less than 90% is of no probative value and should not be received in evidence.
Prior probability of paternity
If the tests do not exclude the man as a putative father, the probability of exclusion is combined with the prior probability of paternity which is the probability that a randomly selected male from the general population will exhibit the gene characteristics found in the mother, the child and the defendant. By use of a formula called the Bayes Theorem, the probability of exclusion is combined with the prior probability of paternity to determine the likelihood of paternity.
Likelihood of paternity
(or the paternity index)
The likelihood of paternity can be estimated by other available empirical evidence in addition to the test results. It is the likelihood of paternity value, as distinguished from the probability of exclusion, which is probative for a jury on the issue of fatherhood. The scientific community calculates the likelihood of paternity only if the blood tests "accumulate a mean probability of exclusion of 90% or more."
The Bayes Theorem derives the likelihood of paternity from the probability of exclusion disclosed by the blood tests of the putative father, mother and child, combined with probability that a random man of the same race shares those genetic characteristics. The likelihood of paternity for the putative father is "the ratio of his probability to the sum of the probabilities for both men." Stated otherwise, "the chance of paternity of a random man is used as a unit of measurement or reference to evaluate the chance of paternity of the putative father."
The court in Imms, 654 S.W.2d at 287 said that an expert may "offer an opinion on the likelihood of paternity formulated by the Bayes Theorem from the tests and the other empirical evidence. In any event, that likelihood, however conclusive numerically, shall be submitted to the trier of fact along with all the other trial nonmedical evidencethe admission of the parties as to the intimacies, the times of the copulations, access by other males to the mother during the period of conception, etc.to come to a determination of paternity."
[3] Section 210.834, dealing with blood tests in a paternity action, reads, in pertinent part:

"1. The court may, and upon request of any party shall, require the child, mother, alleged father, any presumed father who is a party to the action, and any male witness who testifies or will testify about his sexual relations with the mother at the possible time of conception, to submit to blood tests. The tests shall be performed by a court-designated expert qualified as an examiner of genetic markers present on blood cells and components, or other tissue or fluid.
2. The court, upon reasonable request by a party, may order that independent tests be performed by other experts qualified as examiners of genetic or other markers present on blood cells or other components, or other tissue or fluid. In all cases, the court shall determine the number and qualifications of the experts."
See, generally, 43 ALR 4th 579 (Admissibility and weight of blood-grouping tests in disputed paternity cases), and 37 ALR 4th 167 (Admissibility, weight and sufficiency of human leukocyte antigen (HLA) tissue typing tests in paternity cases.)