Filed 2/13/15  County of Los Angeles v. Ifroze CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| COUNTY OF LOS ANGELES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MOHAMMED IFROZE,<br><br>    Defendant and Appellant. | B249559<br><br>(Los Angeles County<br>Super. Ct. No. BY840215) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Nancy Svetich Pogue, Commissioner.  Affirmed.

Mohammed Ifroze, in pro. per., for Defendant and Appellant.

Alexandra Bauer and Richard H. Kim, for Plaintiff and Respondent.

_____

Mohammed Ifroze appeals from a judgment of parentage declaring him to be the father of Niylah Ifroze.[1] On appeal, Ifroze contends (1) there was insufficient evidence to support the trial court's findings; and (2) the trial court erred in admitting into evidence the results of genetic tests regarding his alleged paternity. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2007, the Los Angeles County Child Support Services Department (Department) filed a complaint against Ifroze. The Department requested that the court establish parentage and order child support and health insurance for Niylah, the alleged daughter of Ifroze and Keeshar Antonee Hardiman, subsequently known as Jaylinn Simone. Ifroze denied parentage and requested genetic testing. LabCorp of America (LabCorp) conducted the tests and determined Ifroze could not be excluded as Niylah's father. The "combined paternity index" was calculated as 148,967,311 to 1. An initial child support order entered in 2008 was later set aside. Ifroze requested additional genetic testing, but the parties subsequently stipulated the results would be excluded at trial.

Before trial, Ifroze moved to exclude the results of the first genetic tests on the ground that the Department had not complied with Family Code section 7551, and there were no court-ordered test results. The trial court denied the motion. At trial, Simone testified a female acquaintance whose name she could not remember recommended Ifroze to her in February 2006. Ifroze called Simone and they agreed to meet. In February and March 2006, the two met four times and had sexual intercourse twice. Ifroze twice wore a green and yellow jogging suit. Simone had no other sexual partners around that time. Niylah was born in November 2006, although her expected due date was mid to late December.

---

[1] To avoid confusion we refer to Mohammed Ifroze as "Ifroze," and to Niylah Ifroze by her first name.

On cross-examination, Simone testified that while interacting with Ifroze, she knew him only by a nickname. She did not remember the telephone number she had for him, only that the number had a 415 area code. She did not remember what cell phone carrier she was using at the time. She indicated a friend conducted research on the internet to track down Ifroze, using the nickname and a cell phone number. She did not know the name of the friend. Simone denied telling a nurse at the hospital where she gave birth that "Terry Allen" was Niylah's father.

Ifroze testified he had never seen Simone before the trial and had never spoken with her on the telephone. He testified he did not have a telephone number in the 415 area code in 2006. He further testified that between January and May 2006, he had no sexual relations with anyone. He denied ever owning or wearing a green and yellow jogging suit. He further denied ever being introduced to or receiving a telephone number for someone named Keeshan Hardiman. On cross-examination Ifroze admitted his 2008 California and federal income tax returns reflected he claimed Niylah as a dependent. He testified his aunt filled out the tax returns and filed them for him. He said he mentioned to her he was paying child support for a child that was not his and she suggested he complete the returns as filed. He admitted he signed the returns but claimed he had little knowledge about them.

A witness from LabCorp testified about the genetic test results. Ifroze also offered expert testimony on genetic testing. Ifroze's expert suggested that different methodologies in calculating the paternity index could reduce the probability of paternity.

The trial court found Ifroze not credible: "Respondent's admission of paternity of Niylah on his 2008 Federal and State Income Tax Returns is a prior inconsistent statement. His admission discredits his testimony at trial on a material fact, to wit, whether he engaged in sexual relations with Other Parent. The Court finds Respondent's testimony regarding access was self-serving, biased, and not credible." Although the court acknowledged Simone could not recall many specific facts and was impeached with her prior deposition testimony, it found she was a credible witness. Based on all of the evidence admitted at trial, the court found Ifroze had not rebutted the Family Code

3

section 7555 presumption of paternity by a preponderance of the evidence.[2]  The court granted the Department's motion for a judgment of parentage.  This appeal followed.[3]

## DISCUSSION

As we understand his arguments, Ifroze contends the trial court's judgment was not supported by substantial evidence because Simone was not credible, he established her lack of credibility at trial, and he rebutted the presumption of paternity.  Ifroze further argues the trial court erred in admitting into evidence the genetic test results.  We find no error.

### I.  Substantial Evidence Supported the Judgment of Parentage

"When faced with a challenge to the sufficiency of the evidence to support a judgment, an appellate court, 'indulge[s] in every reasonable inference to uphold the verdict if possible and defer[s] to the [trier of fact's] assessment of the credibility of the witnesses.  [Citation.]  "[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trier of fact]." [Citation.]' "  (*Warren v. Merrill* (2006) 143 Cal.App.4th 96, 109, fn. omitted.)

Ifroze argues Simone's testimony was impeached in certain respects and she was not credible.  However, it is well established that on appeal we do not second guess the trial court's credibility determinations.  " ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category [citation.].  To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.  [Citations.]

---

[2]     All further statutory references are to the Family Code.

[3]     Ifroze filed a notice of appeal on June 18, 2013, after the trial court's ruling on the motion for judgment, but before the filing and entry of the judgment.  We treat the appeal as filed immediately after entry of the July 10, 2013 judgment.  (Cal. Rules of Court, rule 8.104(d).)

Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]" ' That appellate courts rarely reject evidence the trial court found credible is 'understandable when we see that for rejection it is required that the testimony be "wholly unacceptable to reasonable minds" [citation]; "unbelievable *per se*" [citation] such that "no reasonable person could believe the testimony" [citation].' [Citation.]" (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1149, fn. omitted.)

As the trial court acknowledged, Simone's testimony had significant gaps, and she was impeached on certain points with her prior deposition testimony. However, her testimony that she had sexual relations with Ifroze during the period of conception was not physically impossible, obviously false, or otherwise inherently improbable such that we may reject it.

Further, in addition to Simone's testimony, there was evidence that genetic tests indicated Ifroze could not be excluded as Niylah's father, and further that the paternity index was over 100. Pursuant to section 7555, there is a rebuttable presumption of paternity if the court finds the paternity index, "as calculated by the experts qualified as examiners of genetic markers, is 100 or greater." Ifroze did not undermine the presumption by offering evidence that the testing was conducted improperly, or that he was infertile. (See *County of El Dorado v. Misura* (1995) 33 Cal.App.4th 73, 83 (*Misura*).) Although Ifroze testified he never met or encountered Simone, the trial court did not find his testimony credible. We may not second guess that determination. And, while Ifroze offered expert testimony on genetic testing, the expert did not opine the test conducted or the statistical methods employed to calculate the paternity index in this case were invalid. He opined only that other methodologies could produce results that would have resulted in a lower paternity index. He also testified that human error could cause false results. However there was no evidence of such error in this case.

5

Viewing the evidence the trial court accepted, in the light most favorable to the trial court's ruling, we conclude substantial evidence supported the judgment. (*Misura, supra,* at pp. 84-85.)

## II. The Trial Court Did Not Err in Admitting the Results of Genetic Testing

Ifroze further contends the trial court erred in admitting the results of the genetic tests conducted in this case. Ifroze argues that since there was no court or administrative order issued requiring the tests, the results were inadmissible. He also argues no declarations were offered as required by section 7552.5, subdivision (c). We reject both arguments.

Ifroze's first argument appears to be based entirely on *Miller v. Miller* (1998) 64 Cal.App.4th 111 (*Miller*). However, *Miller* is inapplicable to this case. In *Miller*, the child at issue, Samantha, was born to married parents, Michael and Lillian. Over two years after Samantha's birth, her parents separated. Lillian began living with Michael's brother, Gary. Lillian later told Gary he was Samantha's father. (*Id.* at p. 114.) When Michael and Lillian divorced, the court granted them joint legal and physical custody of all of their children, including Samantha. Lillian subsequently married Gary. Gary filed a complaint seeking to determine whether a parent and child relationship existed between Michael and Samantha. Gary alleged he was Samantha's natural father. He attached to his complaint the results of blood tests he had procured on his own. The results suggested Gary was Samantha's biological father, " 'assuming that no close biological relative could also be the father.' " (*Id.* at p. 115.) The trial court granted Michael's motion to quash the complaint. The appellate court agreed that Gary could not prevail on the merits of his complaint as a matter of law because he could not establish he was a presumed father under section 7611. (*Id.* at p. 117.)

In its analysis, the court explained a *conclusive* presumption of paternity applied to Michael, pursuant to section 7540. Under section 7540, "the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage," except as provided in section 7541. Under section 7541, a presumed father under sections 7611 and 7612 may file a motion for blood tests to attempt to

6

establish his paternity, but only within two years of the child's date of birth. In *Miller*, because Gary was not a presumed father, the blood test results he sought to use to challenge Michael's paternity were not ordered by the court or performed by court-appointed experts, and because they were not performed within two years of Samantha's birth, they were of "no legal significance." (*Miller, supra,* at p. 119.) Gary could not use the blood tests he secured to rebut the conclusive presumption of paternity that applied to Michael. As the court explained, "whether or not Gary is in fact Samantha's biological father is immaterial." (*Ibid.*)

The *Miller* court concluded the blood test results Gary sought to use were not admissible to rebut a conclusive presumption of paternity established under section 7540, which promotes social policies such as the "preservation of the integrity of the family and protection of the welfare of children." (*Miller, supra,* at p. 119.) Because the test results were not secured in compliance with section 7541—which sets forth the limited circumstances in which the section 7540 presumption may be rebutted—the results were of "no legal significance." This conclusion has nothing to do to with this case, which involves two unmarried persons, an alleged father attempting to disclaim any parental obligations, and no presumption under section 7540. *Miller* does not stand for the proposition that in *any* matter concerning paternity, only court-ordered blood tests results are admissible or legally significant.

Under section 7551, "[i]n a civil action or proceeding in which paternity is a relevant fact, the court may upon its own initiative or upon suggestion made by or on behalf of any person who is involved, and shall upon motion of any party to the action or proceeding made at a time so as not to delay the proceedings unduly, order the mother, child, and alleged father to submit to genetic tests. If a party refuses to submit to the tests, the court may resolve the question of paternity against that party or enforce its order if the rights of others and the interests of justice so require. A party's refusal to submit to the tests is admissible in evidence in any proceeding to determine paternity."

Nothing in section 7551 states or suggests that a party's voluntary compliance with genetic testing, in the absence of a court order, renders the results of such tests inadmissible when they would otherwise be relevant. Moreover, Ifroze requested a genetic test in his answer to the complaint. The record does not indicate exactly how the LabCorp test came about; there is no evidence of either a trial court order or an administrative order pursuant to section 7558.[4] Yet, the lack of an order did not require the trial court to exclude the test results. Indeed, "ordinarily a blood test is a proper aspect of discovery in a paternity action as being a highly accurate indicator of paternity." (*City and County of San Francisco v. Cartagena* (1995) 35 Cal.App.4th 1061, 1065.) We see no basis in the statutes or otherwise to conclude that if the alleged father, after requesting genetic testing, submits to such testing without a formal court or administrative order, the lack of such an order renders the results of the tests inadmissible.

We likewise reject the argument that the test results were inadmissible because there were no accompanying declarations under section 7552.5. Section 7552.5, subdivision (a), requires that a copy of the results of genetic tests performed under sections 7552 or 7558 be served on all parties, and that the results be accompanied by a declaration of the custodian of records or another qualified employee of the laboratory that conducted the genetic tests. The subdivision sets forth several statements that must be included in the declaration. If such a declaration is provided, under subdivision (b), the test results "shall be admitted into evidence at the hearing or trial to establish paternity, without the need for foundation testimony of authenticity and accuracy," unless there is a written objection filed with the court. (§ 7552.5, subd. (b).)

---

[4] Section 7558, subdivision (b) provides that in "any civil action or proceeding in which paternity is a relevant fact, and in which the issue of paternity is contested, the local child support agency may issue an administrative order requiring the mother, child, and the alleged father to submit to genetic testing," if certain conditions exist, including if the alleged father has requested that genetic tests be performed, or if the mother and alleged father agree in writing to submit to genetic tests.

In this case, while the record does not indicate that such a declaration accompanied any test results, the court admitted live testimony from the laboratory director and custodian of the records. The lab director testified regarding the regular practice of the laboratory in the creation of the record of test results at issue in this case, including the maintenance of records, the positive identification of samples, and the indication that there was no evidence of tampering. We can find no abuse of discretion in the trial court's ruling that there was adequate foundation laid for the admission of the test results into evidence. (*County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1448-1450.)

## DISPOSITION

The trial court judgment is affirmed. Respondent to recover its costs on appeal.

BIGELOW, P.J.

We concur:

FLIER, J.

GRIMES, J.

9